IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Thomas F. Daly, IV, and City News Publishing Company, <br><br> Plaintiffs, <br><br> vs. <br><br> Chris McMurry and McMurry, Inc., <br><br> Defendants. | Civil No. 2:09-cv-2548-DCN <br><br> **ORDER AND OPINION** |

This matter is before the court on defendants' motion to dismiss plaintiffs' complaint, or, in the alternative, to compel plaintiffs to arbitrate their claims in Arizona and stay their federal lawsuit pending arbitration, or alternatively, to transfer the case to the United States District Court for the District of Arizona. Plaintiffs claim that defendants breached the contract governing the sale of plaintiffs' publishing business, which, although not argued explicitly, thereby breached a related employment contract. Defendants argue that plaintiffs are bound by arbitration and forum-selection clauses contained in the contracts and should not be permitted to pursue their claims in the District of South Carolina. For the reasons set forth below, the court grants defendants' motion to compel plaintiffs to arbitrate their claims and stay the federal lawsuit.

**I.  BACKGROUND**

On August 12, 2009, plaintiffs filed a five-count complaint in state court alleging that defendants: (1) fraudulently induced plaintiffs to enter into a contract (the "Asset Purchase Agreement" (APA)) to sell their publishing business; (2) breached the APA; (3)

1

breached the "Amended Asset Purchase Agreement" (AAPA) and violated the South Carolina Payment of Wages Act; and (4) owe plaintiffs an equitable accounting. Compl. ¶ 17-40. Plaintiffs also request that (5) the court find the APA's covenants not to compete unenforceable and enter a declaratory judgment to that effect.

Plaintiffs' complaint arises from the sale of a publishing business previously owned by plaintiffs. The publication, *Vital Speeches of the Day* (*Vital Speeches*)*,* was established by plaintiff Daly's family in 1934 and "contains transcriptions of speeches and maintains an online archive of searchable speeches." Compl. ¶ 7. In late 2005, plaintiffs and defendants entered into negotiations for the sale of the business, and on April 7, 2006, plaintiffs sold the business to defendants pursuant to the APA. Plaintiff Daly also entered into an employment contract with defendants. Both parties signed the "Independent Contractor Agreement" (ICA) on May 1, 2006.

Plaintiffs claim that defendants induced plaintiffs to sell the publishing business by offering to pay plaintiff Daly $250,000 and "an annual royalty equal to 3% of the cash collected from subscribers of *Vital Speeches,*" and offering to employ Daly "for ten years at $70,000 per year for serving as Editor of *Vital Speeches*." Compl. ¶ 8. Defendants offered to pay Daly an additional $20,000 per year for serving as editor of another publication, *Executive Speeches*. Plaintiffs also claim that defendants represented to plaintiffs that defendants would spend $60,000 per year in marketing to address the shrinking subscriber base of *Vital Speeches*.

Plaintiffs entered into the AAPA with defendants on November 20, 2008, as a result of plaintiff Daly producing "EBSCO, a content aggregator, as a customer of

[defendant] McMurry, Inc." Compl. ¶ 14. Under the AAPA, plaintiff "Daly was to receive 20% of any 'up front' money received from EBSCO and 10% of any 'periodic' money received from EBSCO." Compl. ¶ 15.

Plaintiff Daly claims that defendants fraudulently induced him to enter into the APA and then forced him out of his position as Editor of both *Vital Speeches* and *Executive Speeches*, "without just cause and in violation of the [APA and the ICA]." Compl. ¶ 16. Plaintiffs argue that the APA employment term of ten years was a material term of the contract and served as partial consideration for the sale of the publishing business. By terminating plaintiff Daly prior to the end of the ten-year term, plaintiffs claim that defendants breached the APA and should be required under paragraph 6.3(c)[1] to indemnify plaintiffs for misrepresentations made during negotiations for the sale of the publishing business. In addition, plaintiff Daly claims that defendant McMurry, Inc., failed to pay him for amounts due under the AAPA, and to provide an accounting for the marketing expenses defendants were obligated to spend to improve subscriber renewals.

On September 29, 2009, defendants filed a notice of removal based on diversity jurisdiction under 28 U.S.C. § 1332. Defendants then filed a motion to dismiss plaintiffs'

---

[1] Paragraph 6.3(c) of the APA states:

> <u>Indemnification of the Seller</u>. The Buyer hereby agrees to indemnify and hold the Seller (and its employees and agents) harmless from and against any loss, damage or expense (including reasonable attorneys' fees and expenses) suffered by the Seller (or any of its employees or agents) resulting from:
>
> ( c)   any inaccuracy or misrepresentation in any certificate, document, instrument or other information delivered by the Buyer to the Seller in connection with the transactions contemplated hereby . . .

complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6) pursuant to valid forum-selection clauses in both the APA and ICA, or in the alternative, to stay the case and compel the parties to arbitrate plaintiffs' claims pursuant to arbitration clauses in both the APA and ICA. As a second alternative, defendants move the court to transfer the case to the United States District Court for the District of Arizona.

Defendants reference paragraphs 7.1 and 7.13 of the APA to support their arguments, as well as paragraphs 7 and 9 of the ICA. Paragraph 7.1 of the APA reads as follows:

> In the case of any dispute between Buyer and Seller with respect to any matter to be decided pursuant to this Agreement, the Buyer and the Seller agree to submit such matter to the presidents of the Buyer and Seller for resolution. If such presidents are not able to resolve such matter within thirty (30) days, then each of the Buyer and the Seller shall have the right, at its option, to submit such matter to arbitration under the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"). The place of arbitration shall be Phoenix, Arizona. Nothing contained in this Section 10.1 shall be deemed to require any party to agree to submit any dispute to arbitration, and, provided that the matter has first been submitted to the presidents of Buyer and Seller as required hereby and they have not resolved such matter within thirty (30) days, thereafter any of such parties shall be entitled to file legal proceedings with respect to the matter in any court having jurisdiction.

Compl. Ex. B. Paragraph 7.13 addresses "Governing Law/Venue":

> This Agreement shall be governed by and construed in accordance with the internal laws and decisions (as opposed to conflicts of laws) of the State of Arizona. The parties agree and consent that any action or other proceeding with respect to this Agreement shall be brought in U.S. District Court in Phoenix, Arizona.

Compl. Ex. B. Paragraph 7 of the ICA calls for mandatory arbitration:

> Any dispute or controversy arising under, out of or in connection with this Agreement shall be settled by arbitration in Phoenix, Arizona, by and under the prevailing rules and regulations of the American Arbitration Association governing commercial transactions as modified by Section 6[2] of this Agreement. If the parties are unable to agree upon a single arbitrator, the arbitration shall be determined by a panel of three (3) arbitrators, with each party selecting an arbitrator and the two arbitrators selecting a third arbitrator to serve as chairman of the arbitration panel. Except to the extent terms or conditions of this Agreement are illegal or unenforceable under applicable law, the arbitrators shall have no power to modify any of the provisions of this Agreement and their participation is limited accordingly. The arbitration proceedings shall be conducted and maintained in complete confidentiality. A party requesting arbitration hereunder shall give ten (10) days advance written notice, in the manner provided in Section 6.3 hereof, to any other interested party prior to requesting arbitration. The decision of the majority of arbitrators shall be binding on all parties involved and judgment to enforce any such decision may be entered in the Superior Court, Maricopa County, Arizona (and for this purpose each party expressly and irrevocably consents to the jurisdiction and venue of such court). Notwithstanding the foregoing, the parties may proceed with an action prior to the commencement of arbitration solely for the limited purpose of seeking provisional remedies. Arbitration proceedings shall not be postponed or delayed because a party is seeking provisional remedies.

Compl. Ex. B. Paragraph 9 of the ICA sets out "Choice of Law: Jurisdiction and Venue":

> This Agreement shall be deemed to be made under, and shall be construed in accordance with and governed by the laws of the State of Arizona without regard to the conflicts or choice of law provisions thereof. Except for arbitration as may be required by this Agreement, any action to enforce any provision of this Agreement or to obtain any remedy with respect hereto shall be brought in the Superior Court, Maricopa County, Arizona, and for this purpose, each party hereby expressly and irrevocably consents to the jurisdiction and venue of such court.

Compl. Ex. B.

Paragraph 7 of the ICA clearly compels mandatory arbitration in Arizona, and

---

[2] Section 6 of the ICA addresses issues such as "Proceeding Expenses," "Benefits and Burdens," and "Notices and Demands" if a controversy arises under the agreement. Compl. Ex. B.

APA paragraph 7.13 and ICA paragraph 9 clearly select the State of Arizona as the forum for dispute resolution. However, APA paragraph 7.1 is not as clear concerning arbitration. The first half of the paragraph gives the parties the right to submit to arbitration in Arizona, but the second half of the paragraph refers to a section number (10.1) that does not exist in the APA and states that arbitration is not required, and that the parties may pursue legal claims in any court having jurisdiction. Defendants argue that the second half of paragraph 7.1 is a "word processing error" and should be ignored. Defs.' Mem. 2 n.1.

In their motion, defendants first argue that the Federal Arbitration Act (FAA) applies to the contracts at issue. Defendants cite cases decided by the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit which support the enforcement of agreements to arbitrate,[3] and in the case of an ambiguous arbitration clause, defendants argue that Fourth Circuit precedent supports the interpretation of ambiguities in favor of arbitration.[4] Alternatively, defendants assert that plaintiffs' complaint should be dismissed because the forum-selection clauses in the APA

---

[3]Defendants cite Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) ("The FAA reflects 'a liberal federal policy favoring arbitration agreements.'") Defs.' Mem. 5. Defendants also quote Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 813 (4th Cir. 1989) ("The Fourth Circuit has consistently held that arbitration provisions under the FAA 'should be effectuated whenever possible, and federal courts should rigorously enforce agreements to arbitrate.'") Defs.' Mem 4.

[4]Defendants quote United States v. Bankers Ins. Co, 245 F.3d 315, 319 (4th Cir. 2001): "[I]n applying [common law] principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [FAA], due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself are resolved in favor of arbitration. [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" Defs.' Mem. 5.

and ICA are valid under the four-part test enunciated in Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996). As a last alternative argument, defendants contend that the subject matter of this dispute is properly transferable to the District of Arizona pursuant to 28 U.S.C. § 1404.

## II. DISCUSSION

The FAA applies to

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 3 of the FAA requires a stay of proceedings where an issue is "referable to arbitration":

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

"The Federal Arbitration Act, 9 U.S.C. § 1 (1994), embodies a federal policy favoring arbitration. Thus, 'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Drews Dist., Inc. v. Silicon Gaming, Inc., 245 F.3d 347, 349 (4th Cir. 2001) (quoting Moses H. Cone Mem'l

Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). "Of course, whether a party has agreed to arbitration is a matter of contract interpretation and 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Id. (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). "However 'the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'" Id. (quoting Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989)).

> [T]he reach of an arbitration clause is not restricted to those causes of action brought under the contract containing the clause, unless the parties draft a clause so restricted in scope . . . Nor can a party retroactively restrict or eliminate its contractual obligation to arbitrate a dispute by fashioning a limited complaint.

Id. at 350 (internal citation omitted).

At its core, the dispute before the court concerns two related contracts, the APA, covering the sale of *Vital Speeches*, and the ICA, which governs plaintiff Daly's employment by defendant McMurry, Inc., following the sale of *Vital Speeches*.[5] Paragraph 1.3 of the APA clearly references the ICA and describes the general terms of Daly's employment by McMurry, Inc., and paragraph 7.10 incorporates all exhibits (including the ICA) by reference. The parties executed the APA in April 2006, and within a month, the parties executed the ICA. Plaintiffs admit that "[u]nder South Carolina law, [the APA and ICA] . . . must be construed together" because the two

---

[5]Plaintiffs assert a claim based on the AAPA; however, the AAPA is simply an amendment to the APA.

contracts were part of the same transaction. Pls.' Resp. 6.

The facts in the case before the court are strikingly similar to those in <u>Drews</u>, cited above. In <u>Drews</u>, a manufacturer and a distributor entered into two agreements for the sale of video gambling machines. <u>Id.</u> at 348. The parties first entered into a "Letter Agreement," which provided that the parties would enter into an "exclusive distributor agreement," as well as outlining other specific terms regarding the sale of 200 video gambling machines. <u>Id.</u> Several weeks later, the parties entered into the "Distributor Agreement," which "[i]n addition to setting forth the terms governing the parties' commercial dealings . . . contains an arbitration clause, which provides that 'any controversy or claim arising out of or related to [the Distributor Agreement], or the breach hereof, will be settled by arbitration.'" <u>Id.</u> at 349. Rather than entering into arbitration when a dispute arose, the distributor filed suit in federal court "invoking only the terms of the Letter Agreement," alleging "fraud, breach of contract accompanied by a fraudulent act, and negligent misrepresentation." <u>Id.</u> The distributor also sought a declaration "canceling the Letter Agreement and denying arbitrability of the dispute." <u>Id.</u>

The Fourth Circuit found that,

> the parties contractually agreed to arbitrate "any controversy or claim" between them "arising out of or related to" the Distributor Agreement; that remains their obligation. It is immaterial that the present dispute grew out of the Letter Agreement, which contains no arbitration clause, if the dispute also "relates to" the Distributor Agreement.

<u>Id.</u> at 350. The court then determined that the Letter Agreement "related to" the Distributor Agreement.

In its complaint, Drews alleges that SGI misrepresented certain facts to

9

>   entice Drews to purchase the 200 video gambling machines and "enter into a Distributorship Agreement with SGI." Although the complaint carefully alleges only fraud in inducing Drews to enter into the Letter Agreement (and not the Distributor Agreement), it expressly acknowledges, as it must, that the Letter Agreement "contemplated" that the parties would enter into the Distributor Agreement, which "would control the rights of the parties as to the sale of these Odyssey machines" and that, in fact, the parties did enter into this Distributor Agreement less than a month later, on January 15, 1999. Moreover, the Letter Agreement, which Drews maintains provides the sole contractual basis for this controversy, explicitly conditions Drews' obligation to purchase the video gambling machines on the execution of the Distributor Agreement. Indeed, the record reveals that the Distributor Agreement governs all sales of SGI machines to Drews, including those encompassed by the Letter Agreement. Hence, it is plain that the present suit–a dispute over payment for 200 video gambling machines–"relates to" the Distributor Agreement.

Id. at 350-51. As a result, the Fourth Circuit held that the controversy must be submitted to arbitration per the parties' agreement. Id. at 352.

In the case before the court, the APA was executed less than a month prior to the execution of the ICA, and the APA contains an arguably ambiguous arbitration clause (whereas the Letter Agreement in Drews contained no arbitration clause). The arbitration clause in the ICA, like the clause in the Distributor Agreement, is broadly worded. Paragraph 7 states, in part: "Any dispute or controversy arising under, out of or *in connection with* this Agreement shall be settled by arbitration in Phoenix, Arizona, by and under the prevailing rules and regulations of the American Arbitration Association governing commercial transactions . . . ." Compl. Ex. C (emphasis added).

Plaintiffs filed this action as a result of plaintiff Daly's termination prior to the end of the ten-year period specified in the APA and ICA. Plaintiffs' claims focus on the APA and AAPA, while glossing over the existence of the ICA and the arbitration clause

contained therein. Just as the Fourth Circuit found that the Letter Agreement "related to" the Distributor Agreement, it is the court's opinion that the APA is "connected with" the ICA. Plaintiffs admit that plaintiff Daly's continued employment for a period of ten years was part of the inducement to enter the sale of the publishing business. Plaintiffs also admit that the APA and ICA should be construed together as part of the same transaction. The APA, in fact, incorporates the ICA by reference. As such, plaintiffs should not be allowed to skirt the arbitration clause in the ICA by "fashioning a limited complaint." Plaintiffs should also not be allowed to avoid enforcement of the arbitration clause by claiming that the contracts at issue came into existence as a result of fraud in the inducement. According to the Supreme Court in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967),

> [I]f the claim is fraud in the inducement of the arbitration clause itself–an issue which goes to the 'making' of the agreement to arbitrate–the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

Plaintiffs claim fraud in the inducement of the contracts, generally, and not the arbitration clause itself.

Based on the reasoning above and the close parallel between the facts in Drews and those in the case before the court, it is the court's opinion that a disposition of defendants' motion can be reached on the issue of the enforceability of the arbitration clause, without addressing the issues of the forum-selection clause or transferability of the case to the District of Arizona. The FAA, the federal policy in favor of arbitration, and the Fourth Circuit's holding in Drews all support compelling plaintiffs to arbitrate their

claims per the agreed upon terms of the ICA.

### III.  CONCLUSION

For the foregoing reasons, the court **GRANTS** defendants' motion to compel plaintiffs to arbitrate their claims and stay the federal lawsuit.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**February 8, 2010**
**Charleston, South Carolina**